THOMSON NEWSPAPER PUBLISHING, INC., d/b/a Northwest Arkansas Times, and S. D. "Dave" Stokes, Individually and as Publisher of Northwest Arkansas Times
v. Dan COODY

94-908                                   896 S.W.2d 897

Supreme Court of Arkansas
Opinion delivered May 8, 1995
[Rehearing denied June 12, 1995.]

*Warner & Smith*, by: *G. Alan Wooten* and *J. Randall McGinnis*, for appellants.

*Rose & Van Winkle*, by: *Jim Rose III* and *John Van Winkle*; and *John J. Watkins*, for appellee.

*Williams & Anderson*, by: *John E. Tull III* and *Katharine R. Cloud*, for amicus curiae Arkansas Press Association.

ANDREE LAYTON ROAF, Justice. This appeal involves a libel action filed by appellee Dan Coody against the appellants, Thomson Newspaper Publishing, Inc., d/b/a *Northwest Arkansas Times* (*Times*), and S. D. "Dave" Stokes, individually and as publisher of the *Times*. A jury awarded Dan Coody $275,000.00 in com-

pensatory and punitive damages. Appellants raise four points for our review: (1) appellee failed to submit any evidence of libel upon which the jury could base a verdict for appellee; (2) appellee failed to prove actual malice on the part of the appellants by clear and convincing evidence; (3) the trial court erred in allowing evidence of common law malice on the issue of constitutional malice; and (4) the trial court erred in allowing an award of compensatory damages to appellee based upon insufficient and speculative evidence. We hold that the evidence was insufficient to support a finding of actual malice and the judgment is accordingly reversed.

## FACTS

Dan Coody and his spouse, Deborah, relocated to Fayette-· ville from Texas in 1987. The Coodys had been self-employed home builders in Texas and engaged in home remodeling and carpentry work after moving to Fayetteville. In November 1990, Coody was elected to a four-year term on the City Board of Directors of Fayetteville. Prior to his election, Coody had a strong interest in historical preservation and environmental issues and actively opposed such measures as the location of a bar next to an elementary school. After his election, he opposed the development of a new regional airport in the Bentonville area. In May 1992, Fayetteville voted to change its form of government from city manager to mayor-alderman effective January 1, 1993, and an election was to be held in November 1992 for the new mayoral and aldermanic positions.

Coody announced his decision to run for the position of mayor in August 1992. At the time of his announcement, appellant Dave Stokes was the publisher of the *Times* and had come to Fayetteville in September 1991 to assume this position. Coody had been openly critical of the *Times* and Stokes in the months prior to the election, questioning the paper's journalistic integrity and objectivity, and criticizing the relationship between Stokes and the local Chamber of Commerce. Coody had also attempted to divert the city's legal advertising away from the *Times* to a competing area newspaper.

During his campaign for mayor, Coody began hearing rumors that he was secretive about his past prior to moving to Fayetteville, because he had been involved in criminal activities while

in Texas. The rumored activities varied from armed robbery, writing hot checks, and conviction for a drug offense. It was also rumored that Coody was abusive to women. Coody paid a visit to Stokes' office in late September 1992 to inquire if Stokes had heard the rumors and to deny that he had ever been in trouble with the law. Stokes acknowledged hearing the rumors. Coody's offer to provide Stokes with information to repudiate the rumors was declined. Stokes stated that "[w]e have ways of finding these things out."

In late September, Coody wrote the Texas Department of Public Safety and the Arkansas State Police, submitting his full name, birthdate and fingerprints, and requested information regarding any felony or misdemeanor conviction. He received replies from both stating that no criminal records were found. Coody delivered copies of these replies to a reporter from the *Times* and also to the *Springdale Morning News*.

The election was scheduled for Tuesday, November 3, 1992. On Thursday, October 29, 1992, Stokes learned of a poll which showed that Coody was in the lead for the mayor's race. On Friday, October 30, 1992, one of Coody's opponents, Glenn Sowder, held a press conference and aired a recording of a message left by Coody on a telephone answering machine in which Coody, using profanity, complained about one of Sowder's supporters having accused him of being abusive to his wife and other women. On that same day, Stokes engaged a private investigator to delve into Coody's background in Texas. Stokes also claimed to have received information on Thursday, October 29, 1992, concerning Coody's criminal history from a Fayetteville resident who was Coody's high school classmate in Beaumont, Texas; however, the informant testified that she was not contacted by Stokes until Monday, November 2, 1992, at the earliest.

On Saturday, October 31, 1992, the first of the two articles at issue in this case was published on the editorial page of the paper and attributed to Dave Stokes, publisher. The two column article was captioned in large, bold letters, "It's time for Coody's facade to come off," alleged Coody "set up" a letter writing campaign supporting his candidacy, and mentioned that the author had begun "hearing rumors about Coody" shortly after he declared for mayor but "did not give credence to these rumors," because of the desire

to keep the campaign as clean as possible. The article stated that "it's time for the gloves to come off" and went on to accuse Coody of attempting to "mislead the public about who he is and what he stands for," and of exhibiting behavior which casts doubt on his ability to perform under stress. The article included a transcript of the telephone message left for Sowder by Coody with abbreviations and dashes for the profanity used and went on to question, "What's Coody so nervous about?" The article further accused Coody of attacking the newspaper and Stokes because he could not get his way and dictate what the paper printed, accused him of making slurs against Fayetteville, accused him of making accusations without substance in his capacity as councilman and then backing down when his hand was called, and concluded by stating that Coody's rhetoric about loyalties for Fayetteville is a "thin facade covering his real loyalty — to himself."

On Monday, November 2, 1992, Stokes received the private investigator's report which contained no adverse information on Coody and Stokes also contacted the informant. Coody held a press conference on Monday and provided information regarding his background and work history and also published a full page ad in the Times to counter-act the effect of the "facade" article.

On Tuesday, November 3, the morning of the election, the *Times* ran the second article, an interview of Stokes, under the byline of reporter Rusty Garrett. The article was captioned "Times publisher defends probe into past of mayoral candidate." The article stated that Stokes had "taken a leading role" in researching the life and activities of Coody prior to his arrival in Fayetteville and admitted to the employment of a private investigator. The article quoted Stokes as stating he had "uncovered some major discrepancies between information contained in the [investigative] report and that he subsequently received from former Beaumont [Texas] residents who say they knew Coody in high school." Stokes further alleged that the investigation was necessary because Coody "continually refused to answer [questions about his past] throughout the campaign," and it was conducted to "get the real truth" concerning Coody. Stokes explained that a similar investigation was not conducted on the other four mayoral candidates because they "had not been the subject of rumors with the 'severity' of those circulated about Coody."

Stokes went on to state that the investigation revealed that Coody's early life was "very admirable," and he questioned why Coody had not used information concerning his activities in Texas in his campaign. Stokes stated that the probe failed to turn up any information on Coody's life between the mid 1970's and 1986 when he moved to Fayetteville and that the report "had created more questions than it had answered." Stokes accused Coody of not providing details about his past or outlining his past year-by-year.

After losing the election, Coody filed an action for damages against appellants, alleging that the editorial and article published on October 31 and November 2, 1992, contained defamatory and libelous statements which were made with actual and common law malice. He asked for compensation for actual damages to his emotional well-being, personal dignity, disruption of relationships with friends and family, damage to business reputation, standing in the community, and public image, and also requested that punitive damages be awarded. Appellants appeal from the judgment entered in favor of Coody and from the order denying their motion for judgment notwithstanding the verdict. It is undisputed on appeal that Coody was a public figure.

■■■ A defamation action turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. *Little Rock Newspapers* v. *Dodrill*, 281 Ark. 25, 660 S.W.2d 933 (1983). Furthermore, "[a] public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false 'statement was made with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657 (1988) (quoting *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964)). The Supreme Court has recognized that where the first amendment is involved, the appellate court is obligated to make an independent examination of the whole record to make sure the judgment does not constitute a forbidden intrusion on the field of free expression. *Harte-Hanks, supra; Fuller* v. *Russell*, 311 Ark. 108, 842 S.W.2d 12 (1992). However, the heightened standard of appellate review applies only to review of the finding of actual malice, and not to the determination of libel. *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984). The

standard of review for the issue of defamation and other factual findings is whether the jury's verdict can be supported by substantial evidence. *Allred* v. *DeMuth*, 319 Ark. 62, 890 S.W.2d 578 (1994); *Little Rock Newspapers, supra.*

## EVIDENCE OF LIBEL

The jury found, from a preponderance of the evidence, that stated or implied facts published by the appellants in the two articles, were defamatory and false. Coody's principal contention was that the articles accused him of concealing a criminal past and that he had proven by his own denial and the reports submitted by him from the Texas and Arkansas authorities that he had no such past. Because the articles did not specifically mention the nature of the rumors about Coody's past but instead indicated that he was misleading the public and had something to hide, his claim was one of defamation by innuendo. *See Pritchard* v. *Times Southwest Broadcasting*, 277 Ark. 458, 642 S.W.2d 877 (1982). Also, Coody contends the statements regarding the letter writing campaign, his attempts to control to whom the appellants should listen, and the allegations that he was attempting to mislead the public about who he was and what he stood for were defamatory comments on his fitness and desirability as a mayoral candidate. *See Harte-Hanks, supra.*

For purposes of this case, we need not review the findings of the jury that the articles in question contained stated or implied facts which were defamatory and false. Appellee, as a public figure, had the additional burden of proving that such false statements were made with actual malice, and he has failed to meet this burden.

## ACTUAL MALICE

██ This court must conduct an independent review to determine whether there was clear and convincing evidence that the statements were made with actual malice. *Harte-Hanks, supra; New York Times, supra.* The question of whether the evidence in the record is sufficient to support a finding of actual malice is a question of law. *Id.* In discussing the actual malice standard the court has recognized:

[T]he plaintiff in such an action must prove that the defam-

atory publication "was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

. . . .

These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

. . . .

The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith.

*Fuller* v. *Russell*, 311 Ark. 108, 842 S.W.2d 12 (1992) (quoting *St. Amant* v. *Thompson*, 390 U.S. 727, 728, 731, 732 (1968)).

■■ At trial, Stokes testified he believed his statements to be true, but this is of little consequence in making the actual malice determination. *Id.* However, the appellee has failed to present convincing evidence of appellants' awareness of the probable falsity of the statements. Coody testified he did not conduct a letter writing campaign; however, there is no evidence that Stokes was aware that there was no campaign. Further, Coody testified he did not tell Stokes who "he should and should not listen to" in a conversation they had shortly after Stokes came to Fayetteville to assume the position as publisher of the *Times*. Based upon the verdict, the jury apparently believed that Coody, in fact, did not make such a statement to Stokes. However, in *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984), the Supreme Court examined the effect of an "inaccurate description of what Seligson [the author] had actually perceived." The Court noted that the "language chosen was 'one of

a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challanges for the writer." *Id.* The Court concluded that the choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella.

Although *Bose, supra,* addressed the writer's opinion regarding the quality of a loudspeaker system, we find the principles discussed apply generally to a listener's perception. Thus, Stokes' perception, even though possibly mistaken, of a conversation which admittedly occurred must be protected. Coody's testimony of the event simply does not constitute clear and convincing evidence of actual malice.

As to the rumors and the assertions that Coody was misleading the public, the evidence does not support a finding of actual malice. The chronology of events surrounding the publication of the rumors is as follows: the testimony clearly established that rumors of Coody's alleged criminal past were circulating prior to October of 1992. Stokes testified he contacted the informant, Ms. Flynn, on the evening of October 29, and, as a result of that conversation, he decided to hire a private investigator. On Friday, October 30, 1992, Stokes hired a private investigator to research Coody's past. Stokes testified he received the investigator's report on Monday and he contacted the informant to verify her version.

Ms. Flynn, however, testified she did not remember talking to Stokes prior to the publication of the October 31 article. She testified that, to the best of her knowledge, she was first contacted on Monday, November 2. Ms. Flynn testified she told Stokes that she thought Coody had a questionable, at best, reputation in high school. She believed Coody had been involved with the police, but she did not provide any specifics, and further stated that she informed Stokes these were merely her impressions because she did not have any factual information.

The appellee submits that although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is a different matter. *Harte-Hanks, supra.* However, there is no convincing proof that the appellants purposefully avoided the truth. Although there are discrepancies regarding when Stokes contacted Ms. Flynn, there is no proof

that Stokes "entertained serious doubts as to the truth of his publication."

In addition, the appellee cites evidence that Stokes was "hostile" towards Coody. Other employees of the *Times* testified that Stokes was motivated by his desire not to see Dan Coody in office, that Stokes did not believe Coody was a good candidate, and that he believed he had something to hide. A former employee of the *Times* testified Stokes stated in June of 1992 that he thought Coody had been involved in illegal activities and he was going to hire a private investigator.

██ ██ It has been recognized that ill will is admissible circumstantial evidence of actual malice. *Harte-Hanks, supra.* However, even though there is some circumstantial evidence, the proof does not establish actual malice with convincing clarity. Coody seems to argue that both the hiring of the investigator and then not waiting for his report is evidence of actual malice. Coody also points out that Stokes did not talk to Ms. Flynn prior to the October 31 article, because of her testimony that Stokes first contacted her on Monday, November 2. Nevertheless, reckless conduct is not measured by whether a reasonably prudent man would have investigated before publishing, but whether he, in fact, entertained serious doubts as to the truth of the publication. *Harte-Hanks, supra.* Appellee has simply not met his burden of proving actual malice by clear and convincing evidence.

## CONSTITUTIONAL MALICE AND AWARD OF COMPENSATORY DAMAGES

For appellants' third and fourth points, they argue that the trial court erred in allowing evidence of common law malice on the issue of "constitutional malice," and that the trial court erred in allowing an award of compensatory damages based upon insufficient and speculative evidence. Because we reverse on the issue of actual malice, we do not address these issues.

Reversed and dismissed.