[No. B097615. Second Dist., Div. Six. Apr. 24, 1996.]

ANTHONY C. BEILENSON et al., Petitioners, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
RICHARD P. SYBERT, Real Party in Interest.

**COUNSEL**

Rogers & Harris and Michael Harris for Petitioners.

No appearance for Respondent.

Bell, McAndrews & Hiltachk and Charles H. Bell, Jr., for Real Party in Interest.

**OPINION**

**GILBERT, J.**—Our Constitution protects everyone—even politicians. Code of Civil Procedure section 425.16[1] was enacted to discourage the filing of strategic lawsuits against public participation—otherwise known as SLAPP suits. Here, we hold the anti-SLAPP law protects statements made by a candidate for public office and his supporters.

In 1994, petitioner, Anthony C. Beilenson, defeated real party in interest, Richard P. Sybert, in an election for United States Congress. After the

---

[1]Unless otherwise noted, all further statutory references will be to the Code of Civil Procedure.

election, Sybert filed a complaint for libel and injunctive relief against Congressman Beilenson, a campaign worker, a consulting firm, and a campaign committee (hereafter collectively referred to as Beilenson). The complaint alleges that during the week prior to the election, Beilenson distributed and mailed libelous campaign literature.

A campaign mailer, entitled "Rich Sybert Ripped Off California Taxpayers," charged that "[w]hile on the public payroll [at the State Office of Planning and Research], Rich Sybert maintained a private law practice on the side. Sybert's clients included foreign investors, a bank, and an insurance company that had a vested interest in the actions of state government. [¶] Rich Sybert's clients paid him more than $140,000 for providing 'legal services.' Sybert took this money for representing private interests, at the same time he was taking $98,285 a year from taxpayers whom he was supposed to be serving full time. This was a serious conflict of interest and breach of public trust."

The campaign mailer also asserted that Cynthia McClain-Hill was the former vice-chair of the Los Angeles Ethics Commission, that she praised Beilenson, and she questioned whether Sybert could devote full-time attention to his state position and also maintain a private law practice.

The complaint charges the following as being untrue:

1. Sybert "ripped off" California taxpayers because he worked less than full-time for the state;

2. Sybert's maintaining a practice of law while working for the state was unusual and unethical;

3. Sybert represented clients with a vested interest in the actions of state government and this was a conflict of interest and breach of public trust;

4. Sybert received "legal fees" from his clients; and

5. Beilenson misrepresented statements attributed to Cynthia McClain-Hill and also misrepresented that she was the vice-chair of the Los Angeles Ethics Commission.

Beilenson brought a SLAPP motion to dismiss Sybert's lawsuit because it arose from the exercise of his constitutional right of petition or free speech. (§ 425.16.)

In opposing the motion, Sybert argued that Beilenson recklessly failed to take any steps to discover whether Sybert was in violation of Fair Political

Practices Commission (FPPC) laws and whether he was attending to his duties with the Office of Planning and Research. Had Beilenson conducted a reasonable investigation, he would have discovered that Sybert was not in violation of any law.

Sybert offered numerous declarations attesting to his having worked long hours while in the employ of the Office of Planning and Research. He produced a declaration, on information and belief, from a former commissioner of the FPPC, attesting that its records indicate that Sybert had fully complied with the filing requirements of said entity and that FPPC had issued an advisory opinion allowing him to maintain his practice of law. He also included a letter from Cynthia McClain-Hill in which she denied having made the remarks attributed to her in the mailer and stating that she was a member of the ethics commission, but was not the vice-chair.

Beilenson responded with a declaration that, at all times, he believed all of the statements to have been true. He was of the opinion that, although perhaps not illegal, it is a breach of ethical standards and a conflict of interest for a lawyer to maintain a law practice while in the full-time employ of the State of California.

Respondent superior court denied the motion. The court stated that it did not believe section 425.16 to be applicable to political campaigns. Moreover, it found that Sybert met his burden of proving there was a "possibility that [he] will prevail on the claim . . . ." The court did not state what standard of proof it applied in making this determination.

Beilenson sought relief by way of an extraordinary writ. He asserted that section 425.16 applies in a defamation action that arises out of an election campaign. (See *Evans* v. *Unkow* (1995) 38 Cal.App.4th 1490 [45 Cal.Rptr.2d 624]; *Robertson* v. *Rodriguez* (1995) 36 Cal.App.4th 347 [42 Cal.Rptr.2d 464].) Beilenson further maintained that Sybert, a public figure, did not sustain his burden because Beilenson's statements, even if false, were opinions and not made with malice. (*New York Times Co.* v. *Sullivan* (1965) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

Because of the significance of the issues tendered in this petition and because a prompt determination of these issues is necessary, we have granted an alternative writ of mandate. (See *Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 851-852 [143 Cal.Rptr. 695, 574 P.2d 766].)

DISCUSSION

I.

After the parties argued the case and submitted it for decision by this court, they informed us they had settled. The issues tendered here, however,

are of great public import and transcend the concerns of these particular parties. (*Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 746-747 [872 P.2d 143]; *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 622, fn. 6 [111 Cal.Rptr. 704, 517 P.2d 1168]; see also *Wharton* v. *Superior Court* (1991) 231 Cal.App.3d 100, 103 [282 Cal.Rptr. 349].)

Published appellate decisions furnish precedent on matters of compelling public interest. (*State of Cal.* ex rel. *State Lands Com.* v. *Superior Court* (1995) 11 Cal.4th 50, 62 [44 Cal.Rptr.2d 399, 900 P.2d 648]; see Cal. Rules of Court, rule 976.) We offer our decision to give guidance to parties and to trial courts to enable them to better understand the law governing this type of litigation.

## II.

In subdivision (a) of section 425.16, the Legislature declared there to be a "disturbing increase in lawsuits brought primarily to chill the valid exercise of constitutional rights of freedom of speech and . . . participation in matters of public significance . . . should not be chilled through abuse of the judicial process."

When a lawsuit arises out of the exercise of free speech or petition, a defendant may move to strike the complaint. (§ 425.16; *Robertson* v. *Rodriguez*, *supra*, 36 Cal.App.4th at p. 355.) The complaint is subject to dismissal unless the plaintiff establishes "a probability that [he or she] will prevail on the claim." (§ 425.16, subd. (b); *Wilcox* v. *Superior Court* (1994) 27 Cal.App.4th 809, 823-825 [33 Cal.Rptr.2d 446].)

Sybert contends that the statute does not apply to a political campaign. He argues the statute was designed to protect those ordinary citizens who find themselves sued in retaliation for the exercise of their rights under the First Amendment (e.g., homeowners who challenge developers). He invites us to search the legislative record in order to ascertain the intent of the statute.

We need not do so because the statutory language is clear. (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46].) The statute does not limit its application to certain types of petition activity. The Legislature recognized that "all kinds of claims could achieve the objective of a SLAPP suit—to interfere with and burden the defendant's exercise of his or her rights." (*Church of Scientology* v. *Wollersheim* (1996) 42 Cal.App.4th 628, 652 [49 Cal.Rptr.2d 620].)

" '[T]he constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.' " (*Buckley* v. *Valeo* (1976) 424 U.S. 1, 15 [46 L.Ed.2d 659, 685, 96

S.Ct. 612].) "Thus, those engaged in political debate are entitled not only to speak responsibly but to '. . . speak foolishly and without moderation.' (*Baumgartner* v. *United States* [(1944)] 322 U.S. 665, 674 [88 L.Ed. 1525, 1531, 64 S.Ct. 1240].)" (*Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49, 52 [158 Cal.Rptr. 519].)

There is nothing in the language of section 425.16 that denies its use by politicians. We take the statute as we find it, and conclude that section 425.16 is available to Beilenson. (*Matson* v. *Dvorak* (1995) 40 Cal.App.4th 539 [46 Cal.Rptr.2d 880] [section 425.16 motion available where the actionable statement was made during a recall election]; see also *Robertson* v. *Rodriguez, supra,* 36 Cal.App.4th 347 [statute's protection applied where defendant published a mailer which stated that a city councilman, facing a recall, had been fined for operating an illegal business out of his home].)

### III.

We next determine whether Sybert established the probability of his success. ■ Because the existence of the libel action potentially impairs the right of free speech, we will independently decide whether Sybert made a sufficient showing of the probability of success of his lawsuit. (*Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499-511 [80 L.Ed.2d 502, 515-523, 104 S.Ct. 1949]; *Berry* v. *City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1082 [47 Cal.Rptr.2d 661].)

■ As a public figure, Sybert had the burden of showing, by clear and convincing evidence, that the objectionable statements had been made with actual malice. (Elec. Code, § 20501; *Harte-Hanks Communications* v. *Connaughton* (1989) 491 U.S. 657, 659 [105 L.Ed.2d 562, 571, 109 S.Ct. 2678]; *Evans* v. *Unkow, supra,* 38 Cal.App.4th at p. 1496.) Malice may be established by showing that petitioners had recklessly disregarded the truth. (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 732 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].)

The clear and convincing standard requires that the evidence be such as to command the unhesitating assent of every reasonable mind. (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208 [200 Cal.Rptr. 115].) Actual malice cannot be implied and must be proven by direct evidence. (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534]; *Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134 Cal.Rptr. 402, 556 P.2d 764].)

As mentioned, our Constitution affords protection to statements made during the course of debate on political issues. (*Brown* v. *Hartlage* (1982)

456 U.S. 45, 61 [71 L.Ed.2d 732, 746, 102 S.Ct. 1523]; *Monitor Patriot Co. v. Roy* (1971) 401 U.S. 265, 271-272 [28 L.Ed.2d 35, 41, 91 S.Ct. 621].) In the words of Justice Hugo Black, ". . . it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." (*Bridges* v. *California* (1941) 314 U.S. 252, 270-271 [86 L.Ed. 192, 207, 62 S.Ct. 190, 159 A.L.R. 1346].) Under the notions of the First Amendment, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997].)

In *Bose Corp.* v. *Consumers Union of U.S., Inc., supra*, 466 U.S. 485 [80 L.Ed.2d 502], the actionable statements consisted of a writer's unbridled and inaccurate description of a sound system. The Supreme Court noted that the "language chosen was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer." (*Id.*, at p. 512 [80 L.Ed.2d at p. 525].) Nonetheless, because it was protected speech, plaintiff was required to "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of [the] statement." (*Id.*, at p. 511, fn. 30 [80 L.Ed.2d at p. 524].)

The Supreme Court found the writer's description of the speaker system to be inaccurate but, nonetheless, was deserving of the protection of the First Amendment. " '[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive." ' [*New York Times Co.* v. *Sullivan* [(1963)] 376 U.S. [254,] 271-272 (11 L.Ed.2d [686,] 701 [, 84 S.Ct. 710]).]" (*Bose Corp.* v. *Consumers Union of U.S., Inc., supra*, 466 U.S. at p. 513 [80 L.Ed.2d at p. 525].)

■ Sybert established that there was nothing illegal or unethical in keeping his law practice while in the employ of the state. In addition, he presented evidence that he was working full-time at the Office of Planning and Research and a letter from Cynthia McClain-Hill in which she disavowed making the statement attributed to her.

The mailer here proclaimed it to be wrong for a state official to have an outside job, the implication being that all of the official's time, attention, and energies ought to be devoted to his public post. This conduct, in the opinion of Beilenson, was a "rip-off." This colorful epithet, when taken in context with the other information contained in the mailer, was rhetorical hyperbole that is common in political debate. (*Greenbelt Pub. Assn.* v. *Bresler* (1970)

398 U.S. 6, 14 [26 L.Ed.2d 6, 15, 90 S.Ct. 1537]; *Rizzuto* v. *Nexxus Products Co.* (S.D.N.Y. 1986) 641 F.Supp. 473, 481.) As such, the term "rip-off" was not defamatory.

The mailer also criticized Sybert for representing clients who would stand to profit from their association with him. It offered the opinion that such a situation constituted a conflict of interest. Even if the clients did not profit from this association, the mailer opined there had been an unwholesome appearance of impropriety: payment of legal fees in the hope of gaining some advantage through his position.

Sybert's practice of law, and his receipt of substantial fees from a certain class of clients, while employed as a state official, do not violate the law. Nonetheless, a citizen could possess the belief that such a custom violates a higher code of ethical precepts. To charge a breach of ethics is not to charge a breach of the law. Beilenson's accusations were statements of opinion entitled to the protection of the First Amendment. (*Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 284 [41 L.Ed.2d 745, 761-762, 94 S.Ct. 2770]; *Robertson* v. *Rodriguez, supra,* 36 Cal.App.4th at p. 359.)

Even if the statements are deemed to be untruthful and not statements of opinion, Sybert was required to establish by clear and convincing evidence that Beilenson was aware of the probable falsity of the statements and willfully directed the publication of the libel. (*Garrison* v. *Louisiana* (1964) 379 U.S. 64, 79 [13 L.Ed.2d 125, 135-136, 85 S.Ct. 209].) Sybert charges that had Beilenson contacted the FPPC he would have discovered that Sybert was in compliance with the law. "Failure to investigate does not in itself establish bad faith." (*St. Amant* v. *Thompson, supra,* 390 U.S. 727, 733 [20 L.Ed.2d 262, 268]; *Evans* v. *Unkow, supra,* 38 Cal.App.4th at pp. 1498-1499.) The record here lacks evidence upon which a reasonable fact finder could find that Beilenson acted with the requisite malice.

Sybert's declaration from a former commissioner of the FPPC was on information and belief. "An averment on information and belief is inadmissible at trial, and thus [be used to] show a probability of prevailing on the claim." (*Evans* v. *Unkow, supra,* 38 Cal.App.4th at p. 1498.)

Sybert also fails to make such a showing on the question of Beilenson's failure to obtain the consent of Ms. McClain-Hill. Sybert tendered a copy of a letter from her in which she stated she did not recall authorizing the use of her name to attack Sybert. She denied knowledge of the statements or that she had authorized them. The letter is not a verified declaration under penalty of perjury. Moreover it is contradicted by a sworn declaration from

Rick Taylor, a Beilenson campaign worker. Taylor states that Ms. McClain-Hill had approved of the statements that were attributed to her in the mailer. There was no showing by Sybert that Beilenson or any of his staff had actual malice—i.e., knowledge that her statements were false or unauthorized. Beilenson reasonably relied upon Taylor's representation that he had obtained her authorization. (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 258 [208 Cal.Rptr. 137, 690 P.2d 610].)

Section 425.16 requires that Sybert demonstrate he would *"probably"* prevail in his lawsuit. (*Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at p. 824.) Moreover, under the precept of *New York Times* and its progeny, Sybert was required to show a likelihood that he could produce clear and convincing evidence of Beilenson's purported malice. (*Robertson* v. *Rodriguez, supra*, 36 Cal.App.4th at pp. 359-360.)

We conclude that, in view of Beilenson's defenses under the Constitution, Sybert did not establish the probability that he would prevail in this lawsuit. The motion to dismiss should have been granted.

## IV.

Sybert also contends he may proceed with his action against Beilenson under Elections Code sections 20501 and 20502.[2] These sections provide that campaign advertising is subject to libel and slander causes of action. We agree with Sybert that these sections apply to candidates for state and federal office.

Nevertheless, they do not assist him. Elections Code section 20501 permits an action for slander or libel, provided the commission of the slander or libel is "willfully *and* knowingly" made. (Italics added.) He does not meet this rigorous standard.

---

[2]Elections Code section 20501 (formerly section 12528) states: "(a) A candidate or state measure proponent is liable for any slander or libel committed by a committee that is controlled by that candidate or state measure proponent as defined by Section 82016 of the Government Code if the candidate or state measure proponent willfully and knowingly directs or permits the libel or slander. [¶] (b) A person who is a sponsor of a sponsored committee, as defined by Section 82048.7 of the Government Code, is liable for any slander or libel committed by the sponsored committee if the sponsor willfully and knowingly directs or permits the libel or slander."

Elections Code section 20502 (formerly section 12530) states: "(a) In any action for libel or slander brought by a candidate, the willingness or unwillingness of the defendant to retract or correct a communication made in the course of a campaign, and his or her action in doing so, shall be admissible in evidence in the exemplary damages phase of a bifurcated trial. [¶] (b) The remedy provided by this section is in addition to any other remedy provided by law."

## V.

It is unfortunate that many political campaigns are uncivilized affairs. Will Rogers commented that "[a] clean campaign is one where each side cleans the other of every possible vestige of respectability." (Sterling, The Best of Will Rogers (1979) p. 78.) Nor is the lack of civility a recent phenomenon. Abe Lincoln observed that all of "the [political campaigns] in which I have been prominent have been marked with great rancor." (Winn, Lincoln Dictionary (1959) p. 96.)[3]

Hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders. Political mischief has been part of the American political scene since, at least, 1800.[4]

In any election, public calumny of candidates is all too common. "Once an individual decides to enter the political wars, he subjects himself to this kind of treatment. . . . [D]eeply ingrained in our political history is a tradition of free-wheeling, irresponsible, bare knuckled, Pier 6, political brawls." (*Desert Sun Publishing Co.* v. *Superior Court, supra,* 97 Cal.App.3d at p. 54.) To endure the animadversion, brickbats and skullduggery of a given campaign, a politician must be possessed with the skin of a rhinoceros. (*Hein* v. *Lacy* (1980) 228 Kan. 249, 263 [616 P.2d 277, 286].) Harry Truman cautioned would-be solons with sage advice about the heat in the kitchen.[5]

Nevertheless, political campaigns are one of the most exhilarating phenomena of our democracy. They bring out the best and the worst in us. They

---

[3]Abe Lincoln, Horace Greeley, Williams Jennings Bryan, Teddy Roosevelt, Franklin Roosevelt, and Barry Goldwater were assailed by their opponents as being crazy. Washington, Jefferson, Andrew Jackson, Woodrow Wilson, and Grover Cleveland were subject to planted stories concerning their sexual escapades. Eisenhower was falsely accused of being a communist; William Howard Taft of being anti-Christian; Franklin Roosevelt of being Jewish; and John C. Fremont of being Catholic. (See generally, *Desert Sun Publishing Co.* v. *Superior Court, supra,* 97 Cal.App.3d at p. 51; Shields-West, The World Almanac of Presidential Campaigns (1992).)

[4]In the presidential race of 1800, Thomas Jefferson hurled invectives against John Adams accusing him of excessive vanity, extreme jealousy, seeking to establish an Adams dynasty, and plotting against George Washington. Adams called Jefferson, among other things, a drunk, a coward, as being of mixed blood, an anti-Christian, and supporter of the French Jacobins. (Smith, The Shaping of America (1980) pp. 285-289.)

[5]Like a tourist who runs with the bulls at Pamplona, a politician cannot complain should he be gored during the spectacle. (Cf. *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696].)

Having survived an election, a public official must be prepared to accept the insults and invectives directed during the candidate's term in office. (*Yorty* v. *Chandler* (1970) 13 Cal.App.3d 467 [91 Cal.Rptr. 709].)

allow candidates and their supporters to express the most noble and, lamentably, the most vile sentiments. They can be fractious and unruly, but what they yield is invaluable: an opportunity to criticize and comment upon government and the issues of the day.

The candidate who finds himself or herself the victim of misconduct is not without a remedy. Those campaign tactics which go beyond the pale are sanctionable under FPPC laws. (Elec. Code, § 16000 et seq.; *Gooch* v. *Hendrix* (1993) 5 Cal.4th 266 [19 Cal.Rptr.2d 712, 851 P.2d 1321] [election set aside for illegal absentee ballots].)

It is abhorrent that many political campaigns are mean-spirited affairs that shower the voters with invective instead of insight. The elimination from political campaigns of opprobrium, deception and exaggeration would shed more light on the substantive issues, resulting in a more informed electorate. It would encourage more able people to seek public office.[6] But to ensure the preservation of a citizen's right of free expression, we must allow wide latitude.

Legislation designed to bring civility into election campaigns is difficult to draft. It can easily sap vitality from the election process and run afoul of the First Amendment. "A community that imposed legal liability on all statements in a political campaign deemed 'unreasonable' by a jury would have abandoned the First Amendment as we know it." (*Monitor Patriot Co.* v. *Roy, supra,* 401 U.S. 265, 275 [28 L.Ed.2d 35, 43].)

Sybert has not cited a single case in which a candidate has recovered damages for defamatory statements arising during the course of a campaign. In the solitary case that we found, the defamatory statements went well beyond the pale of what is protected under the First Amendment. (*Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324 [a magazine knowingly and falsely printed that a presidential candidate suffered from a serious mental illness].)

The overwhelming weight of authority is that campaign rhetoric is protected speech and, as such, recovery by a candidate is highly unusual. (*Monitor Patriot Co.* v. *Roy, supra,* 401 U.S. 265 [28 L.Ed.2d 35]; *Desert Sun Publishing* v. *Superior Court, supra,* 97 Cal.App.3d at p. 51; *Thomson Newspaper Pub., Inc.* v. *Coody* (1995) 320 Ark. 455, 465 [896 S.W.2d 897, 903]; *Vail* v. *The Plain Dealer Publishing Co.* (1995) 72 Ohio St.3d 279 [649

---

[6] With this noble goal in mind, the Legislature has enacted a Code of Fair Campaign Practices. (Elec. Code, § 20440.) This law affords a candidate for public office the opportunity to voluntarily take a pledge that he or she will run a clean campaign. There is no remedy, however, for the candidate's breach of this pledge. (*Schaefer* v. *Williams* (1993) 15 Cal.App.4th 1243, 1247-1248 [19 Cal.Rptr.2d 212].)

N.E.2d 182]; *Carr* v. *Brasher* (Tex. 1989) 776 S.W.2d 567; *Valento* v. *Ulrich* (Minn. 1987) 402 N.W.2d 809, 813; *Hein* v. *Lacy*, *supra*, 228 Kan. 249 [616 P.2d 277]; *Clark* v. *Allen* (1964) 415 Pa. 484, 488 [204 A.2d 42, 44].)

Our form of democratic government is dependent upon the unfettered exchange of information. (*Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. at pp. 339-340 [41 L.Ed.2d at p. 805].) The "[p]reservation of free expression is of particular urgency in the political arena, since it is almost universally agreed that a major purpose of the First Amendment is to ensure vigorous, uninhibited discussion of governmental affairs." (*Varanese* v. *Gall* (1988) 35 Ohio St.3d 78, 83 [518 N.E.2d 1177].)

SLAPP lawsuits stifle free speech. (*Church of Scientology* v. *Wollersheim*, *supra*, 42 Cal.App.4th at p. 652.) They undermine the open expression of ideas, opinions and the disclosure of information. "The marketplace of ideas, not the tort system, is the means by which our society evaluates [and validates] those opinions." (*Grillo* v. *Smith* (1983) 144 Cal.App.3d 868, 872 [193 Cal.Rptr. 414].) The threat of a SLAPP action brings a disquieting stillness to the sound and fury of legitimate political debate. The SLAPP action here has no place in our courts.

The alternative writ is discharged and the petition is dismissed as moot.

Stone (S. J.), P. J., and Yegan, J., concurred.