

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-16-139

| | |
|---|---|
| DANIEL GREENBERG<br>APPELLANT<br><br>V.<br><br>HORIZON ARKANSAS<br>PUBLICATIONS, INC., ET AL.<br>APPELLEES | **Opinion Delivered:** May 24, 2017<br><br>APPEAL FROM THE SALINE COUNTY<br>CIRCUIT COURT<br>[NO. 63CV-13-164]<br><br>HONORABLE GRISHAM PHILLIPS, JUDGE<br><br>AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

Daniel Greenberg sued Horizon Arkansas Publications, Inc., et al. (sometimes referred to as appellees) for defamation.[1]  Greenberg's lawsuit arose out of a series of editorials published in 2010 in the *Benton Courier* and written by Kristal Kuykendall who served as editor of the paper at the time.  The Saline County Circuit Court granted summary judgment in favor of appellees, and Greenberg appealed.  We affirm.

### I. *Background*

Daniel Greenberg served as a state representative in the Arkansas General Assembly from 2006 to 2010.  In 2010, Greenberg was a candidate in the Republican primary for Arkansas State Senate District 22, a portion of which is located in Saline County.  Greenberg's opponent was former state representative Jeremy Hutchinson.

---

[1]Horizon Arkansas Publications, Inc., owns and publishes the *Benton Courier*, a Saline County newspaper.

During the course of the election, the *Benton Courier* published a series of editorials written by Kristal Kuykendall about Greenberg, Hutchinson, and their respective campaigns. The editorials were published on March 7, 2010 (First Editorial), March 28, 2010 (Second Editorial), April 19, 2010 (Third Editorial), and April 26, 2010 (Fourth Editorial).

The First Editorial addressed two topics pertinent to Greenberg. Kuykendall began by engaging in a general discussion of what she considered to be dishonest political advertising. She mentioned a television advertisement by Greenberg in which he quoted the *Benton Courier*: "You should appreciate having legislators like Dan Greenberg on your side." This quote had been written in a 2009 editorial praising Greenberg's work for open government. Kuykendall believed that the use of the quote made it appear that the newspaper was endorsing Greenberg when it was not. She also disagreed with the use of this quote because it was written by a previous editor of the *Benton Courier*. Later in the editorial, Kuykendall wrote that she had previously "swor[n] on the spot that [Greenberg would] never have [her] support as a candidate for anything" as a result of a comment he was said to have made about access to healthcare. Kuykendall explained that, "basically, when someone questioned whether the nation's health care system was broken because not everyone has access to health care, Greenberg's response was something like: Of course everyone in America has access to health care; all they have to do is go to the emergency room."

Unhappy with the First Editorial, Greenberg requested and was granted a meeting with Kuykendall and her publisher, Bryan Bloom. Greenberg agreed to modify the

television advertisement to state, "[Y]ou should appreciate having legislators like Dan Greenberg on your side because of his work for open government." Kuykendall indicated in an email to Greenberg that the revisions adequately addressed their concerns.

Shortly thereafter, Kuykendall wrote the Second Editorial. In that editorial, she favorably addressed Greenberg's modified television advertisement and his meeting with the *Benton Courier* staff that led to the modification. She praised Greenberg for "paying attention to the small-town local paper" and "for being flexible and for striving for the most honest political campaign commercial possible in this situation." She also raised an issue reported to her by one of Greenberg's constituents—that Greenberg promised to have the mailboxes of the elderly moved closer to their front doors and, according to his constituent, broke the promise. Further, Kuykendall praised Greenberg's volunteerism at a community-care clinic.

Greenberg's case hinges on Kuykendall's Third Editorial, in which Kuykendall addressed four issues relating to Greenberg. First, she discussed polls that showed Greenberg trailing Hutchinson in their state-senate race. Secondly, she noted that Greenberg was using the same address for both his legislative and his campaign offices and mentioned that this "would appear to be a violation of Arkansas campaign ethics." Next, she wrote that Greenberg had listed as supporters on campaign materials individuals who were either neutral or supported Hutchinson. Lastly, she characterized Greenberg's allegation in a campaign mailer that Hutchinson lobbied for new taxes as "hatefully dishonest."

Following the publication of the Third Editorial, Greenberg requested to publish a responsive guest column in the *Benton Courier*, and appellees agreed to the request.

Greenberg's column generally rebutted Kuykendall's criticisms of him and challenged her journalistic methods.

Finally, the *Benton Courier* published the Fourth Editorial, which presented no new information but Kuykendall wrote, "I stand firmly behind every fact I presented in [the Third Editorial] column. I'm afraid I can't say much more right now . . . ."

In 2013, Greenberg sued appellees for libel. The circuit court ultimately granted a motion for summary judgment filed by appellees after thorough briefing and an extensive hearing. Greenberg timely appealed from the order granting summary judgment.

The sole issue presented in this appeal is whether the circuit court erred by granting summary judgment to appellees on Greenberg's defamation claim. When reviewing whether a motion for summary judgment should have been granted, our court determines whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Bomar v. Moser*, 369 Ark. 123, 251 S.W.3d 234 (2007). We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Meadors v. Still*, 344 Ark. 307, 40 S.W.3d 294 (2001).

## II. *The Elements of the Defamation Claim*

"A defamation action turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation." *Thompson Newspaper Publ'g, Inc. v. Coody*, 320 Ark. 455, 461, 896 S.W.2d 897, 901 (1995). A plaintiff claiming defamation must establish (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by

the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) the damages suffered by the plaintiff. *Southall v. Little Rock Newspapers, Inc.*, 332 Ark. 123, 132, 964 S.W.2d 187, 192 (1998).

It is uncontroverted that, at the time of publication, Greenberg was a public figure, and a public figure may not recover for defamation without clear and convincing proof that any false statements were made with actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989). A public figure "invite[s] attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). The heightened level of scrutiny in public-figure cases is imposed to protect the free exchange of ideas.

To grant summary judgment, the circuit court was required to determine whether the evidence presented by appellees left a material question of fact unanswered. *Bomar, supra*. The only elements in controversy are (1) whether actual malice was shown by appellees, (2) whether the statements made were false and defamatory, and (3) whether Greenberg was damaged. A holding that there is insufficient evidence to create a material question of fact with regard to any of these elements requires our court to affirm the circuit court's ruling.

### III. *Actual Malice*

In public-official cases, our review is based on whether the evidence "could support a reasonable jury's finding that actual malice was shown by clear and convincing evidence." *Southall*, 332 Ark. at 133, 964 S.W.2d at 193. A finding of actual malice requires that a statement be made with knowledge that it is false or with reckless disregard of whether it

was false. *Harte-Hanks*, 491 U.S. at 659 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).

The meaning of actual malice and more particularly reckless disregard is not readily captured in one infallible definition. *Harte-Hanks*, 491 U.S. at 686 (citing *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968)). "The actual–malice standard is not satisfied merely through a showing of ill will or malice in the ordinary sense of the term." *Harte-Hanks*, 491 U.S. at 666. There must be sufficient evidence to permit the conclusion that the defendant entertained serious doubts as to the truth of his publication. *Id.* at 688. In other words, the defendant must have an "awareness of the probable falsity of the statements." *Fuller v. Russell*, 311 Ark. 108, 113, 842 S.W.2d 12, 15 (1992).

Direct evidence of actual malice is undoubtedly rare. Accordingly, "[a]lthough courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks*, 491 U.S. at 668. Here, Greenberg seeks to establish a material question of fact with regard to actual malice through circumstantial evidence. This evidence is primarily in the form of evidence of Kuykendall's hostility toward Greenberg and her alleged inadequate investigation into the information contained in the editorials. Nevertheless, our guidepost is whether there was clear and convincing evidence presented that Kuykendall made statements about Greenberg with the knowledge that they were false or with reckless disregard of whether they were false. *Id.* at 659. We hold that the evidence does not rise to the level necessary to create a material question of fact regarding actual malice.

We acknowledge that there is evidence tending to show that Kuykendall harbored hostility toward Greenberg. Viewing the evidence in the light most favorable to Greenberg, one could conclude that Kuykendall had hostility toward him before she wrote her First Editorial. Kuykendall admitted in that editorial that she did not support Greenberg's candidacy due to a comment he purportedly made regarding access to healthcare.

Discovery also produced emails written by Kuykendall after the Third Editorial was published indicating that Kuykendall was hostile toward him. She wrote to Jeremy Hutchinson that Greenberg "makes [her] want to vomit," "brings shame to the name of Christ," and that "his actions have greatly inspired [her] to want to expose him for who and what he really is." Kuykendall also wrote to Dennis Milligan, the Republican party chairman, and said, "[Greenberg] is a f–ing liar," "[i]t is personal now," and "he is a fake and he is making it my mission to expose him for who and what he really is—a snake." These emails certainly indicate that Kuykendall harbored anger and hostility toward Greenberg.

Nevertheless, Kuykendall's hostility toward Greenberg is not actionable unless there are material facts in evidence tending to show that she published a statement about him with the knowledge that it was false or with reckless disregard of whether it was false. Kuykendall wrote that she wanted to "expose" Greenberg and that he was a liar. In an email to Milligan, she wrote, "[i]f his advertising was above-board and honest . . . none of this would be an issue." She also wrote to Milligan that Greenberg was threatening to sue the *Benton Courier* even though "he doesn't have a FREAKING LEG TO STAND ON LEGALLY." Kuykendall's emails reveal that she believed what she had written.

Greenberg also criticizes Kuykendall's investigative and journalistic methods and contends they constitute circumstantial evidence of actual malice. We acknowledge that "reckless conduct is not measured by whether a reasonably prudent man would have investigated before publishing, but whether he, in fact, entertained serious doubts as to the truth of the publication." *Coody*, 320 Ark. at 465, 896 S.W.2d at 903. The evidence on Kuykendall's investigative measures fails to show that she entertained serious doubts regarding the truth of any of her publications.

Greenberg objects to Kuykendall's journalistic techniques, specifically her lack of communication with him and later her communication with his opponent, Jeremy Hutchinson. Although Greenberg questions the quality of her investigation, the evidence demonstrates that Kuykendall did, in fact, investigate each of the statements made in her columns. Specifically, Kuykendall spoke to Whit Jones, the former editor of the *Benton Courier*; Bryan Bloom; Jeremy Hutchinson; Greenberg's elderly constituent; Greenberg's office landlord; a representative from The Northwest Arkansas Home Builders Association; Rita Looney, an attorney at the Arkansas Ethics Commission; and various persons listed as supporters on Greenberg's campaign material. Additionally, she requested documents to support the information she received, reviewed those documents, and conducted her own research.

Greenberg places much emphasis on Kuykendall's discussion with Rita Looney as being evidence of actual malice. Kuykendall contacted Looney about what she believed "would appear to be a violation of Arkansas campaign ethics" because Greenberg was using the same address for his campaign and legislative offices. Looney executed an affidavit about

her conversation with Kuykendall that was filed by Greenberg with his response to the motion for summary judgment. In her affidavit, she recalls her conversation with Kuykendall and her impression that Kuykendall had concluded that Greenberg had committed an ethics violation irrespective of Looney's explanation. A writer's "perception, even though possibly mistaken, of a conversation which admittedly occurred must be protected." *Coody*, 320 Ark. at 464, 896 S.W.2d at 902. Considering Looney's affidavit in the light most favorable to Greenberg in fact benefits appellees' position because it demonstrates that Kuykendall did investigate Greenberg's alleged ethical violation and indicates that Kuykendall actually believed Greenberg committed an ethics violation.

The standard of proof in defamation cases involving public figures is high. Evidence of actual malice must be proved by clear and convincing evidence, and the mere presence of some circumstantial evidence is insufficient to create a factual question. *Coody* is particularly instructive on the evidence sufficient to prove actual malice. 320 Ark. 455, 896 S.W.2d 897. In the *Coody* opinion, our supreme court acknowledged that hostility is circumstantial evidence of actual malice but held that the evidence in that case was insufficient to establish malice with convincing clarity to reach a jury.

Here, the circumstantial evidence presented by Greenberg was insufficient to create a material question of fact regarding whether Kuykendall made any statements with knowledge they were false or with reckless disregard of whether they were false. Because the evidence could not support a reasonable jury's finding that actual malice was shown by clear and convincing evidence, we agree with the circuit court that Greenberg's defamation claim cannot survive.

IV. *False, Defamatory Nature of Statements*

Irrespective of whether there are facts to demonstrate that appellees had actual malice toward Greenberg, an "allegedly defamatory statement must also imply an assertion of an objective verifiable fact." *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 956, 69 S.W.3d 393, 402 (2002). In cases with media defendants, statements on matters of public concern must be provable as false before there can be liability for defamation. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). This "ensure[s] that the debate on public issues remains 'uninhibited, robust, and wide-open.'" *Id.* at 20. (citing *New York Times Co. v. Sullivan*, 376 U.S. at 270 (1964)).

Arkansas has set forth several factors that must be weighed in order to determine whether a statement may be viewed as implying an assertion of fact. *Faulkner*, 347 Ark. 941, 69 S.W.3d 393. These factors are (1) whether the author used figurative or hyperbolic language that would negate the impression that he or she was seriously asserting or implying a fact; (2) whether the general tenor of the publication negates this impression; and (3) whether the published assertion is susceptible of being proved true or false. *Id.* at 956, 69 S.W.3d at 402–03.

We begin our analysis by acknowledging that the general tenor of the publication negates the impression that facts are being asserted in any of the editorials. Each editorial appeared on the opinion page of the *Benton Courier* and included a disclaimer that "[a]ny opinions expressed in this column are hers alone and do not represent the opinions of the Courier." Additionally, Kuykendall wrote in the First Editorial, "I would like to reiterate that these are all my opinions and NOT the opinions of the newspaper."

Turning our attention to the individual statements, there are two remarks directed toward Greenberg in the First Editorial. Kuykendall accused Greenberg of dishonest advertising when he included a quote from the *Benton Courier* that "you should appreciate having legislators like Dan Greenberg by your side." Kuykendall perceived that Greenberg took the statement in the *Benton Courier* out of context to make it appear as though the newspaper endorsed him. Whether Greenberg's advertisement was dishonest is not provably false. Greenberg admitted as much when he submitted to the appellees a proposed retraction commenting "whether a quote is taken out of context is often a matter of opinion that people can reasonably disagree about . . . ." Kuykendall also wrote that "basically, when someone questioned whether the nation's health care system was broken because not everyone has access to health care, Greenberg's response was something like: Of course everyone in America has access to health care; all they have to do is go to the emergency room." Kuykendall prefaced her statement by offering that this was not a direct quote by Greenberg but rather her understanding of what he had said. Her understanding of what Greenberg said is not objectively verifiable. Additionally, Kuykendall utilized hyperbolic language in her discussion of Greenberg's alleged comments. She said Greenberg's comments left her "so speechless" and "dumbfounded" that she "swore on the spot" that she would not support him. We hold that no statements in the First Editorial are defamatory.

Similarly, no statements in the Second Editorial qualify as defamatory. In the Second Editorial, Kuykendall praised Greenberg's volunteerism, favorably discussed Greenberg's revised television advertisement, and relayed a report from a disgruntled constituent who

claimed Greenberg offered to have her mailbox moved and did not deliver on his promise. The first two statements were favorable to Greenberg, and Greenberg does not dispute that the exchange regarding the mailbox occurred.

The Third Editorial has four statements that require our consideration. First, Kuykendall discussed two election polls that allegedly showed Greenberg trailing Hutchinson. Greenberg does not give much credence to the results of the polls because they were unscientific. Nevertheless, he does not dispute that the results of these polls showed him trailing Hutchinson. Accordingly, this statement is not provably false. Second, Kuykendall wrote about Greenberg's use of an inaccurate list of supporters on his campaign mailers. In Greenberg's brief, he mentioned that "most if not all" of his supporters were listed correctly. That, in and of itself, is a virtual concession that this was not a provably false statement. Greenberg's deposition testimony also indicates this was not false. Third, Kuykendall characterized one of Greenberg's campaign mailers as "extraordinarily misleading" and "hatefully dishonest" because it accused Hutchinson of lobbying for new taxes. The evidence reflects that Kuykendall investigated whether Hutchinson had lobbied for new taxes and determined that he had not. Thus, there is evidence tending to show that this was a subjective determination and not provably false. Additionally, these statements included clear hyperbolic language. Therefore, none of these statements are defamatory.

The fourth and final statement that we must examine is Kuykendall's remark that Greenberg's use of the same office for legislative and campaign headquarters "appears to be a violation of Arkansas campaign ethics." In oral argument, Greenberg asserted that this

statement serves as the crux of his case. An ethics complaint was lodged by a citizen against Greenberg apparently as a result of this column. Greenberg was ultimately cleared of any wrongdoing. However, we must consider the statement in the context of whether the words "appears to be" made this statement incapable of being proved true or false. This distinction depends on whether Kuykendall gave an opinion rather than an assertion of fact. If an opinion implies an assertion of fact, it is a statement for purposes of a defamation claim. *Milkovich*, 497 U.S. at 19. Here, we hold that Kuykendall's statement does not imply an assertion of fact. She set forth the facts that led to her conclusion that Greenberg had committed an ethics violation. Her conclusion is based on her subjective determination from the evidence before her, and her subjective determination is not provable as true or false.

With regard to the Fourth Editorial, Kuykendall makes no new statements about Greenberg, and accordingly, nothing in the Fourth Editorial is provable as false. Without any assertions of fact that are provably false, Greenberg's claim for defamation cannot survive summary judgment.

## V. *Damages*

Because we hold that the defamation claim cannot go forward, we need not address whether there is a material question of fact regarding whether Greenberg was damaged by the editorials.

## VI. *Conclusion*

There is insufficient evidence to create a material question of fact with regard to whether appellees had actual malice toward Greenberg and whether the statements made in

13

the editorials were false and defamatory.  Accordingly, the circuit court's order granting summary judgment in favor of appellees is affirmed.

Affirmed.

GLADWIN and GLOVER, JJ., agree.

*Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor* and *Tasha C. Taylor*, for appellant.

*Quattlebaum, Grooms & Tull PLLC*, by: *John E. Tull III* and *Everett C. (Clark) Tucker IV*, for appellees.