FARM BUREAU INSURANCE COMPANY of
ARKANSAS, INC. *v.* RUNNING M FARMS, INC.;
S&K Farms, Inc.; Sumner Mitchell

05-920                                                    237 S.W.3d 32

Supreme Court of Arkansas
Opinion delivered June 1, 2006

[Rehearing denied September 7, 2006.]

*Wright, Berry, Hughes & Moore,* by: *Rodney Moore,* for appellant.

*Crisp, Boyd & Poff, Schubert & Burgess L.L.P.,* by: *Mark C. Burgess,* for appellees.

Robert L. Brown, Justice. Appellant Farm Bureau Mutual Insurance Company of Arkansas, Inc. (Farm Bureau) appeals from a judgment in favor of appellees Running M Farms, Inc.; S&K Company, Inc.; and Sumner Mitchell.[1] Farm Bureau raises several points for reversal, including lack of standing on the part of Sumner Mitchell to sue. It further contends, in the case of Running M Farms, Inc. and S&K Company, Inc. (the farming corporations), that Arkansas has not recognized the tort of negligent performance of an insurance contract and that there was insufficient proof of tortious interference with a contract or business expectancy. We agree with Farm Bureau, and we reverse and remand.

We set out a portion of the relevant facts in the first appeal of this matter:

> Mitchell, a farmer, is president of Running M Farms and S&K Company, two farms located in Hempstead and Lafayette Counties. On March 18, 1997, Mitchell purchased crop-hail insurance from Appellant for wheat crops that he had planted on each farm. One policy covered 520 acres of the 590 acres of wheat planted on Running M Farms, and a second policy covered the entire 350 acres of wheat planted at S&K Company. According to eyewitnesses, a storm moved through the area where the farms were located on the

---

[1] Sumner Mitchell is the president and a shareholder of these two corporations. Mitchell testified that he and his oldest daughter, Leslie Mitchell, were the shareholders of Running M Farms, Inc., and that he and his youngest daughter, Kelly Mitchell Green, were the shareholders of S&K Company, Inc.

morning of April 22, 1997, producing heavy rains, high winds, and marble-sized hail. Mitchell testified that at the time of the storms he was at a nearby airstrip where he maintained a crop-dusting business. After the storm passed, Mitchell drove to his farms to determine if his crops had sustained any damage. Mitchell visited S&K Company first, where he discovered some wheat plants with split flag leaves, bruised stems, and a few broken-over plants. He then went to Running M Farms and again noticed some plants with split flag leaves and bruised stems. According to Mitchell, of the wheat planted at Running M Farms, all but a twenty-acre circular patch, was hit by hail.

Mitchell contacted William Tipton, a staff adjuster for Appellant, to report the damage to his wheat crops. After inspecting the crops, Tipton sent Mitchell a letter stating, "[t]here is no coverage under your crop hail policy for damage to the flag leaf of your wheat. If you see some direct damage in the future to the head or stalk, I will be happy to reinspect the wheat again with you." While harvesting the wheat on S&K Company, Mitchell noticed some damage to the stalks and heads. He contacted Tipton and requested a reinspection. Following this reinspection, Appellant offered Mitchell $6,900 in settlement of his claim.

After declining the offer, Appellees filed suit, alleging that Appellant had breached its contract resulting in damages of $70,000 to Running M Farms and $54,000 to S&K Company. Appellees filed several amended complaints during the course of this litigation, adding various claims for extra-contractual damages, fraud, bad faith, and tortious interference with a business expectancy. The case was originally scheduled to go to trial on August 23, 1999, but after Appellant filed a pleading entitled "Confession of Judgment," admitting liability under the insurance policy in the amount of $76,000, the matter was continued, and a new trial was scheduled for June, 2000.

Appellant subsequently filed a motion to withdraw its confession of judgment on the basis that the parties were in dispute regarding the effect of the confession and that it was not possible to avoid a trial. The trial court granted Appellant's request, and the case proceeded to trial on June 22, 2000. At the close of Appellees' case, Appellant moved for a directed verdict, but the motion was denied. Appellant then rested without presenting any further evidence. The case was submitted to the jury, which was unable to agree on a verdict. The jury was then dismissed and a mistrial declared. Following the mistrial, Appellant filed "A Motion For

Judgment Notwithstanding The Verdict And Motion To Deny New Trial," alleging that Appellees failed to present sufficient proof to create a jury question on the breach of contract issue and also failed to offer proof as to the amount of damages incurred. The trial court denied Appellant's motion and this appeal followed.

*Farm Bureau Mut. Ins. Co. of Arkansas, Inc. v. Running M Farms, Inc.,* 348 Ark. 313, 315-17, 72 S.W.3d 502, 504-05 (2002) (*Running M Farms I*). We dismissed the appeal and cross-appeal in *Running M Farms I* due to the fact that the circuit court's denial of Farm Bureau's motion for a judgment notwithstanding the verdict was not a final, appealable order.

There are other relevant facts necessary to a full understanding of the current appeal which were not included in our factual recitation in *Running M Farms I*. After the appellees filed their first suit in 1997, the circuit court dismissed their bad-faith claim in 1998, following a motion by Farm Bureau. After the mistrial was declared in the first trial and the first appeal of this matter in 2002, which resulted in our opinion in *Running M Farms I*, Farm Bureau again confessed judgment in this matter on the insurance-policy claims in the amount of $45,000 for Running M Farms, Inc., and $31,500 for S&K Company, Inc., for a total of $76,500. The confessed judgment for breach of contract is not an issue in this appeal, which leaves only those matters regarding the appellees' tort claims in contention.

The second trial in this matter was held in 2004. At that trial, Mitchell testified that in 1997, he made Farm Bureau an offer of settlement of "$50,000, somewhere like that," and then for fifty percent of the value of the policies, which he estimated at about $62,000. Following jury verdicts on special interrogatories, the circuit court entered an amended judgment on June 9, 2005, and awarded the contract damages previously confessed as well as these damages in tort: Sumner Mitchell, $1,477,994.20; Running M Farms, Inc., $402,311.50; and S&K Company, Inc., $388,811.50. The circuit court refused to award a twelve percent penalty and attorney's fees to the appellees under Ark. Code Ann. § 23-79-208 (Repl. 2004).

## I. Standing of Sumner Mitchell

We first address the issue of whether Sumner Mitchell had standing to sue Farm Bureau based on that insurer's performance of the insurance policies it had entered into with the farming corporations.

Farm Bureau claims that Mitchell had no standing as a shareholder or guarantor of the farming corporations to raise the tort claims. Thus, Farm Bureau urges that on the issue of Mitchell's standing to sue as an individual, the circuit court erred in denying its motion to dismiss, its motion for summary judgment, its motion for a directed verdict, and its motion for judgment notwithstanding the verdict. Mitchell counters that he had standing to sue as a third-party beneficiary under the policies at issue, both as a shareholder and as a guarantor.

We treat the question of standing to sue as a threshold issue. *See, e.g., Brewer v. Carter*, 365 Ark. 531, 231 S.W.3d 707 (2006). It is fundamental in American jurisprudence that in order to bring a lawsuit against an opposing party, one must have standing to do so. Without standing, a party is not properly before the court to advance a cause of action. *See Hufsmith v. Weaver*, 285 Ark. 357, 687 S.W.2d 130 (1985).

Farm Bureau raised the issue of Mitchell's standing to the circuit court in its motion for summary judgment, but that court denied the motion and permitted Mitchell to proceed to trial on his tort claims. We conclude that the circuit court's decision to allow Mitchell to proceed at trial constituted a ruling in Mitchell's favor on the issue of standing, even though the court did not specifically address standing in its order. As standing is now raised by Farm Bureau on appeal, we must consider whether Mitchell, in fact, had standing to sue in this case, though he was not a named insured under the Farm Bureau insurance policies. The question of standing is a matter of law for this court to decide, and this court reviews questions of law *de novo. See, e.g., Craven v. Fulton Sanitation Serv., Inc.*, 361 Ark. 390, 206 S.W.3d 842 (2005).

*a. Third-Party Beneficiary*

Farm Bureau maintains that Mitchell's claims must fail because he was not an insured under either insurance policy. The farming corporations were the insureds under the policies, and the only wrong complained of by Mitchell was the failure of Farm Bureau to pay the farming corporations their claims in a timely fashion. Farm Bureau additionally contends that Mitchell has no individual right of action as a corporate officer or as a majority shareholder or guarantor for wrongs allegedly inflicted on the corporation by a third party, especially when the farming corporations have filed suit for such wrongs on their own behalf.

Mitchell responds that he is entitled to bring an action against Farm Bureau because he was a third-party beneficiary under the policies at issue and because of his separate and distinct status as a corporate shareholder of the farming corporations. He points to the testimony of Byron Kelly Kelner, an agent of Farm Bureau, who testified that he wrote the insurance policies "for Mr. Mitchell on March 18, 1977," and that he "felt like" he was insuring Mitchell as well as the farming corporations.

■ We agree with Farm Bureau that Mitchell is not a third-party beneficiary under the insurance policies based on Mr. Kelner's testimony. With respect to that testimony, Farm Bureau points out that this parol evidence offered by Mitchell does not alter the legal relationship of the parties established by the written insurance policies. Farm Bureau emphasizes that the integration provision of the policies dictates that the policy terms control without reference to such parol evidence.[2] Additionally, this court has said that "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." *U.S. Rubber v. Northern*, 236 Ark. 381, 384, 366 S.W.2d 186, 188 (1963); *see also Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 343 Ark. 224, 232, 33 S.W.3d 128, 134 (2000) (holding that "[i]t is a general proposition of the common law that in the absence of fraud, accident or mistake, a written contract merges, and thereby extinguishes, all prior and contemporaneous negotiations, understandings and verbal agreements on the same subject").

---

[2] From our review of the insurance policy, it appears that the following provision is what Farm Bureau refers to as the integration provision:

. . . .

**9. ENTIRE AGREEMENT, WAIVER OR CHANGE OF POLICY PROVISIONS.**

This policy, the application as accepted by us, and any endorsements issued by us and attached hereto constitute the entire agreement between you and us. A waiver or change of any provision must be in writing and approved by us. Our request for an appraisal or examination will not waive any of our rights.

### b. Shareholder Status

Mitchell also claims that he has standing to sue as the primary shareholder of the farming corporations. However, to reiterate, neither Mitchell's claim nor his alleged harms were separate and distinct from that of the farming corporations, but rather, all appellees made the same claim for the same alleged wrong: that Farm Bureau did not timely pay insurance proceeds to the farming corporations, thus causing financial reversals for all the appellees.

This court has recognized the "near universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock." *First Commercial Bank, N.A. v. Walker*, 333 Ark. 100, 110, 969 S.W.2d 146, 151 (1998), *cert. denied* 525 U.S. 965 (1998). The Arkansas Rules of Civil Procedure provide that a shareholder may bring a derivative action on behalf of a corporation to enforce a right of the corporation when the corporation has failed to do so. Ark. R. Civ. P. 23.1 (2006). But in order for a shareholder to bring an individual cause of action against a third party, that shareholder must be injured for a wrong directly or independently of the corporation. *See Golden Tee, Inc. v. Venture Golf Schools, Inc.*, 333 Ark. 253, 969 S.W.2d 625 (1998). This court has further determined "that individual stockholders [have] no standing to sue in their individual capacities for injuries allegedly suffered primarily by the corporation and its shareholders[.]" *Id.* at 260-61, 969 S.W.2d at 629; *see also Walker*, 333 Ark. at 110, 969 S.W.2d at 151 (holding that "[a] corporate officer has no individual right of action against a third party for alleged wrongs inflicted on the corporation, even if the officer is the sole shareholder"). Additionally, this court has held that "direct suits are appropriate only where a shareholder asserts a direct injury to the shareholder distinct and separate from harm caused to the corporation." *Golden Tee, Inc.*, 333 Ark. at 261, 969 S.W.2d at 629 (internal quotations omitted) (quoting *Hames v. Cravens*, 332 Ark. 437, 442, 966 S.W.2d 244 (1998)).

Mitchell has not shown that his tort claims are separate and distinct from the harm caused to the farming corporations. Rather, the appellees' claims are the same, that Farm Bureau was dilatory in paying the claims of the farming corporations which had severe economic repercussions for those corporations as well as Mitchell. Accordingly, we conclude that Mitchell did not have standing to raise his individual claims as a shareholder of the

farming corporations as they were not separate and distinct from the claims formally raised by those corporations.

### c. Guarantor

We turn next to the question of whether Mitchell had standing to sue Farm Bureau as a personal guarantor of the debts of the farming corporations. In the instant case, Mitchell had personally guaranteed payment of the loans made by People's Bank and Loan and other creditors.

This court has defined a guarantor as "one who makes a contract, which is distinct from the principal obligation, to be collaterally liable to the creditor if the principal debtor fails to perform." *Walker*, 333 Ark. at 112, 969 S.W.2d at 152. In *Walker*, the individual stockholder and guarantor of the corporation was Walker, who claimed that he should have standing to bring a lender-liability action against the Bank because he was a party to the loan agreements between his company, Aerth, and the Bank and because he was a guarantor of the various loans. This court, however, concluded that Walker had acted as a representative of the corporation and as a guarantor of the debt, and that these actions did not provide him with standing to maintain a separate, individual action against the Bank apart from the corporation. Accordingly, we reversed and dismissed Walker's claim due to lack of standing.

In the instant case, Mitchell attempts to distinguish *Walker* by explaining that in that case, this court noted that Walker did not allege that the Bank's conduct caused a third party to discontinue a contractual relationship with him. Thus, seeking to distinguish his case from that in *Walker*, Mitchell merely asserts that he had proven that the wrongful actions of a third party (Farm Bureau), not the lending institution, caused his creditors to fail to continue a contractual relationship with him. We fail to see how this distinction conveys standing on Mitchell to sue independently from the farming corporations in the case at hand.

We further look to the case of *Hufsmith v. Weaver*, 285 Ark. 357, 687 S.W.2d 130 (1985), to determine whether Mitchell's status as a guarantor conveys standing for him to sue individually. In that case, Hufsmith, who was the president, majority shareholder, and guarantor of Ready Mix, claimed that his posture as the guarantor made him a third-party beneficiary to the contract. He argued that as a result, this gave him standing to individually sue a third party who had allegedly engaged in tortious interfer-

ence with a Ready Mix contract. The facts were that Ready Mix had entered into a contract to sell its assets to Razorback Quality Concrete Company (RQCC). This sale was dependent on the issuance of industrial revenue bonds, which allegedly were not issued because of a fraudulent lawsuit filed by the third party to block the bond issue. Hufsmith further alleged that the third party, who was a competitor of Ready Mix, knew that the failure of the bond issue, and thus of the sale, would cause the financial ruin of Ready Mix.

In an affidavit, Hufsmith stated that because of the tortious interference with Ready Mix by the third-party company, which caused Ready Mix to lose the contract, Hufsmith was forced to use his own assets to pay off obligations of Ready Mix, which he had personally guaranteed. Despite these circumstances, this court concluded that Hufsmith's status as a guarantor did not give him standing to sue on behalf of Ready Mix for tortious interference with Ready Mix's contract. This court explained that even accepting Hufsmith's claim that he was the guarantor of obligations owed by Ready Mix, there was no allegation or evidence that Ready Mix owed him anything when the contract was entered between Ready Mix and RQCC so as to give Hufsmith a financial interest. Thus, he could not claim a third-party beneficiary status. In fact, it was only after the contract was entered into that Hufsmith received a demand letter requesting that he personally pay the notes he had guaranteed.

This court further reasoned that had the sale between Ready Mix and RQCC been consummated, any financial obligation owed by Ready Mix to Hufsmith would have been discharged because there would have been no default by Ready Mix on the loans. Thus, no duty on the part of Ready Mix to reimburse Hufsmith, as a creditor, would have arisen. We cited to the *Restatement of Contracts* and noted that "[t]he duty or obligation of the promisee to the purported third-party creditor beneficiary and the prospect of satisfaction of that duty by performance are integral elements of the description of a third-party creditor beneficiary according to the [*Restatement of Contracts, Second*, § 302(1)(a) (1981)]." *Hufsmith*, 285 Ark. at 360, 687 S.W.2d at 132. We affirmed the summary judgment in favor of the third-party competitor due to Hufsmith's lack of standing to sue.

Mitchell also tries to distinguish *Hufsmith* by referring to an equipment-lease agreement between Mitchell and the farming corporations and contends that that qualified as a financial obliga-

tion. However, based on this court's definition of a guarantor, it is not this lease arrangement that makes Mitchell a guarantor of the farming corporations. Rather, it was the fact that he pledged his own personal assets to guarantee payment of the loans taken out by the farming corporations. Further, Farm Bureau underscores the fact that there was no proof at trial that the insurance proceeds, once paid to the farming corporations, were intended to satisfy the lease payments to Mitchell. According to Farm Bureau, the proof was that the proceeds were to be used to pay the bank and other third-party creditors. Moreover, Farm Bureau states that there was no testimony that the lease payments went unpaid but there was proof at trial that Mitchell actually owed the farming corporations more than $300,000, an amount well in excess of the lease payments owed to him.

We hold that, under both *Hufsmith* and *Walker*, Mitchell's status as a guarantor of the farming corporations does not give him standing to sue Farm Bureau individually as a third-party beneficiary. The circuit court erred in refusing to grant summary judgment in favor of Farm Bureau on the issue that Mitchell lacked standing to sue as an individual. We reverse the judgment in favor of Sumner Mitchell and dismiss. The remainder of this opinion will concern Farm Bureau's appeal relative to the farming corporations.

## II. Negligent Performance of an Insurance Contract

Farm Bureau next mounts several arguments against the tort claims of the farming corporations. Its primary points are that Arkansas does not recognize an independent tort for negligent performance of an insurance contract and that recovery of damages under both contract and tort claims amounts to double recovery. The crux of Farm Bureau's argument is that the language of the insurance policies controls any claims by the farming corporations against Farm Bureau and that their theory of tort relief has not been adopted in this state. We agree on both points.

There is no question about the fact that the insurance policies exclude consequential damages for the farming corporations by viewing the following language:

### 14. EXCLUSIONS

. . . .

b. Consequential, special or indirect damages. . . .

But, in addition, with respect to the tort claims, Arkansas has never recognized the tort of failure to act (nonfeasance) apart from the tort of bad faith. *See Findley v. Time Ins. Co.*, 264 Ark. 647, 653, 573 S.W.2d 908, 911 (1978) ("Prosser has pointed out that an action in tort cannot ordinarily be based upon a breach of contract which amounts to mere nonfeasance, which means not doing the thing at all, as distinguished from misfeasance, which means doing it improperly.").

This court has upheld tort claims in two *non-insurance* cases where the conduct could be characterized as misfeasance. In *Westark Specialties, Inc. v. Stouffer Family Ltd. Partnership*, 310 Ark. 225, 836 S.W.2d 354 (1992), this court noted that courts have extended tort liability for misfeasance whenever the misconduct involves a foreseeable, unreasonable risk of harm to the plaintiff's interests. In *Westark Specialties*, this court held that a tenant could maintain a negligence action against the landlord for a breach of the contractual duty to maintain the sprinkler system which the landlord had failed to do. This court held that the claim in negligence was permitted because the harm was both foreseeable and unreasonable. Based on this court's description, the action in tort appeared to be one for misfeasance.

Similarly, in *Terminix International Co. v. Stabbs*, 326 Ark. 239, 930 S.W.2d 345 (1996), this court allowed a tort action for wrongful acts of *misfeasance* arising out of the performance of a contract where the risk was foreseeable and unreasonable. This court held that "[a] termite company's failure to properly inspect a residence and report on the extent of damage can be said to involve a foreseeable, unreasonable risk of harm to potential buyers of the residence." *Terminix Int'l Co.*, 326 Ark. at 243, 930 S.W.2d at 348.[3]

In the case at hand, the farming corporations claim that their tort theory for delayed payment is supported by the following statement made by this court in *Reynolds v. Shelter Mutual Insurance Co.*, 313 Ark. 145, 852 S.W.2d 799 (1993):

---

[3] In *Albright v. Southern Farm Bureau Life Insurance Co.*, 327 Ark. 715, 940 S.W.2d 488 (1997), this court characterized the wrong in *Westark Specialties, Inc.* (failure to maintain sprinkler system under lease), and *Terminix International Co.* (failure to inspect for termites and report) as nonfeasance under the contract when, in reality, the wrongs in each case were foreseeable and fall more readily in the category of affirmative wrongs or misfeasance. The characterization of the wrongs as nonfeasance in *Albright* was a misstatement by this court.

> [T]he rule as stated in *Findley*, provides yet another remedy in tort for an insured who feels his claim has not been adequately investigated by his insurer. Although an insurer's actions, or inaction as the case may be, may not amount to a claim for bad faith, those same actions or inactions may support a claim in contract for nonperformance (breach of contract) or a claim in tort for defective performance.

*Reynolds*, 313 Ark. at 149-50, 852 S.W.2d at 802. We disagree with the farming corporations' characterization of this statement. The context of this language, which cites to the *Findley* case, clearly denotes that Arkansas has not recognized a tort for mere nonperformance by an insurance carrier.

Furthermore, the focus of this court in *Findley* was to discuss the tort of bad faith, which it described as "an extension of the well-established rule by which a liability insurance company may be accountable in tort for its failure to settle a claim within the policy limits." *Findley*, 264 Ark. at 649, 573 S.W.2d at 909. We went on to discuss the situation where an insurer is confronted with a conflict of interest in how to settle an insurance claim. We said that "that conflict of interest has led the courts to hold, as we did in *Blissett* [*Members Mutual Insurance Co. v. Blissett*, 254 Ark. 211, 492 S.W.2d 429 (1973)] and earlier cases, that the insurance company may be liable for fraud, bad faith, or negligence if it *fails to investigate and settle a claim* against its insured." *Id.* (emphasis added). Later in *Findley*, this court specifically stated that it does not agree with the rule that an insurance company exposes itself to an action in tort simply by denying a claim. We added that the "[m]ere refusal to pay insurance cannot constitute wanton or malicious conduct when, as here, an actual controversy exists with respect to liability on the policy." *Id.* at 651, 573 S.W.2d at 910. This court emphasized that if this were not the rule, then a claimant could recover punitive or exemplary damages in every action that involved a refusal to pay an insurance policy. *See id.*

Despite this analysis in *Findley*, the farming corporations attempt to convince this court that the distinction between nonfeasance and malfeasance is irrelevant in the instant case because the foreseeability requirement for negligent performance has been established. They refer to the testimony of a Farm Bureau witness, Kevin McKenzie, who stated that both he and Farm Bureau were aware of the foreseeable harm and damage to Mitchell if the insurance claim was not timely paid. According to the farming

corporations, the actions of Farm Bureau constituted misfeasance because Farm Bureau did not merely sit on its hands and do nothing. Rather, the agents of Farm Bureau came to the farms on three occasions but refused to meet the demands of the corporations.

■ We conclude that it is clear from this court's case law that Farm Bureau's actions exhibit a dispute over the measure of damages dating back to 1997, when settlement negotiations began. A failure to satisfy the farming corporations' claims may breach the applicable contracts, but it is not actionable in tort. Stated differently, the farming corporations have not proven that Farm Bureau acted wrongly (misfeasance), but simply that they failed to act with the necessary dispatch (nonfeasance) and agree to the dollar figures of the farming corporations. As already illustrated in this opinion, the two cases described above *(Westark Specialities, Inc.* and *Terminix International Co.)* recognize causes of action in tort for wrongful action or misfeasance — not nonfeasance. Thus, the appellees have not cited to this court a case from our jurisdiction that recognizes a cause of action in tort apart from bad faith or wrongful action.

In sum, the mere refusal to pay a disputed insurance claim cannot constitute misfeasance, not to mention wanton or malicious conduct, when there is an actual controversy with respect to liability. *See Findley, supra.* The farming corporations' claim for bad faith was dismissed by the circuit court in 1998, and those corporations have been awarded judgment for damages for breach of contract totaling $76,500. That is their sole avenue for relief under the facts of this case. We reverse the judgment of the circuit court awarding the farming corporations damages in tort for nonperformance of the insurance contracts and dismiss due to the absence of a recognized cause of action.

### III. Tortious Interference

Farm Bureau further argues that proof of tortious interference on its part with the business relationship between the farming corporations and third-party creditors as well as the farming corporations and Mitchell is lacking. Thus, Farm Bureau contends that any award of damages to the farming corporations based on tortious interference must be reversed.

■ We note, initially, that the special verdict forms completed by the jury are for *negligence* committed by Farm Bureau, not intentional torts. One element of tortious interference with a

contract or business expectancy is *intentional* interference by the defendant, as both parties to this appeal recognize. *See, e.g., Walt Bennett Ford, Inc. v. Pulaski County Special Sch. Dist.*, 274 Ark. 208, 624 S.W.2d 426 (1981). In the instant case, there was no finding of intentional conduct on the part of Farm Bureau by the jury. Accordingly, we conclude that the damages awarded to the farming corporations are not in connection with the tort of tortious interference. We reverse and dismiss on this point as well.

*IV. Penalty and Attorney's Fees*

The farming corporations contend, on cross-appeal, that they should recover all reasonable attorney's fees attributable to filing suit against Farm Bureau, because Farm Bureau failed to pay their claims within the time specified in the policies after a demand had been made. They rely on our statute, which reads in pertinent part:

> (a)(1) In all cases in which loss occurs and the cargo, property, marine, casualty, fidelity, surety, cyclone, tornado, life, accident and health, medical, hospital, or surgical benefit insurance company and fraternal benefit society or farmers' mutual aid association or company liable therefor shall fail to pay the losses within the time specified in the policy after demand is made, the person, firm, corporation, or association shall be liable to pay the holder of the policy or his or her assigns, in addition to the amount of the loss, twelve percent (12%) damages upon the amount of the loss, together with all reasonable attorney's fees for the prosecution and collection of the loss.

Ark. Code Ann. § 23-79-208(a)(1) (2004).

The farming corporations contend that when a defendant insurance company in a direct-action lawsuit confesses judgment after suit is filed, the determination of whether its insured is entitled to recover attorney's fees and a twelve percent penalty under the statute depends on whether the insurance company had an opportunity to settle the case for a lesser amount than originally sued for in the original complaint. *See Equitable Life Assurance Soc. of the United States v. Gordy*, 228 Ark. 643, 309 S.W.2d 330 (1958). The farming corporations explain that they made a pre-suit offer to Farm Bureau in an amount less than what Farm Bureau confessed that it owed in its confession of judgment almost two years after the 1997 lawsuit was commenced. According to Mitchell's testi-

mony, he offered to settle the corporations' claims in 1997 for approximately $50,000 and then about $62,000, before his lawsuit was filed. Farm Bureau subsequently confessed judgment in 1999 for $76,500.

In *Gordy*, this court said:

> And we have held that the attorney's fee and penalty attaches if the insured is required to file suit, even though judgment is confessed before trial. A good faith denial of liability is no defense to the claim for attorney's fee and penalty.

*Gordy*, 228 Ark. at 647, 309 S.W.2d at 333 (internal citations omitted).

Farm Bureau asserts that *Gordy* is distinguishable, because in this case there was no written demand for a lesser amount of $62,000 prior to the confession of judgment in the amount of $76,500. Farm Bureau adds there was no delay in the confession of judgment because it was made on the same day that the farming corporations' fourth amended complaint was filed.

We agree with the farming corporations that they are entitled to the twelve percent penalty and reasonable attorney's fees. Our holding in *Gordy* favors their position, irrespective of the fact that Mitchell's settlement offer in 1997 was orally made. We reverse and remand for the circuit court to award a twelve percent penalty based on the confessed judgment for breach of contract and to determine reasonable attorney's fees.

Reversed and dismissed on direct appeal and reversed and remanded on cross-appeal.