Bob BOMAR  *v.*  Keith MOSER
and Barry Jewell

06-895                                          251 S.W.3d 234

Supreme Court of Arkansas
Opinion delivered March 1, 2007

*Timothy O. Dudley*, for appellant.

*Barber, McCaskill, Jones & Hale, P.A.*, by: *Robert L. Henry, III,* and *R. Kenny McCulloch*, for appellee Barry Jewell.

ANNABELLE CLINTON IMBER, Justice. Appellant Bob Bomar filed a legal malpractice suit against Appellees Barry Jewell and Keith Moser, of the law firm of Jewell, Moser, Fletcher & Holleman, P.A. After protracted discovery, the circuit court granted summary judgment in favor of Appellees on the grounds that Bomar's claims were barred by the applicable statute of limitations and Bomar lacked standing to bring the suit. Bomar brings the instant appeal, arguing that the circuit court erred in granting summary judgment because (1) Appellees' fraudulent concealment of their wrongful acts tolled the statute of limitations; (2) Bomar had standing to pursue his claims; (3) Appellees' affirmative defenses should have been stricken on account of their assertion of the Fifth-Amendment privilege against self-incrimination; and (4) an adverse inference should have been drawn against Appellees due to their assertion of the Fifth-Amendment privilege. We affirm on the last two points, but we conclude that genuine issues of material fact remain concerning Bomar's standing and the tolling of the statute of limitations as a result of fraudulent concealment. Thus, we reverse and remand on the standing and fraudulent concealment issues.

In 1986, Bob Bomar and three other investors started Scanning Technologies Incorporated (STI), a software company. Jewell eventually became legal counsel for both STI and Bob Bomar. By 1993, STI was experiencing financial difficulties, and

Bomar's fellow shareholders were seeking buyers for their shares. Jewell allegedly told Bomar that his partner, Moser, had two interested clients, FBN Investments, Inc., (FBN) and EAB Enterprises (EAB). FBN loaned STI an initial amount of $400,000 and took a security interest in the company. EAB acquired 51% of STI's stock, leaving Bomar as a minority shareholder. Later, Bomar was elected both president and secretary of STI, and Jewell was elected treasurer.

After the buy out, Jewell and Moser told Bomar that EAB and FBN wanted their law firm to take over the management of STI's accounting and financial records. Shortly thereafter, Bomar was taken off the signature card for STI's bank accounts. Also, at Appellees' behest, Bomar signed several documents on behalf of STI without receiving copies and without having knowledge of the documents' contents.

In 1997, STI and Boeing North American Services, Inc., (Boeing) were working together on a contract with Coca Cola Enterprises in Charlotte, North Carolina. During that time, Boeing became interested in licensing STI's MLMS software. Boeing sent Ken Sweet to Arkansas to initiate negotiations with STI. Sweet came prepared with business plans that included several variations on two basic options: (1) Boeing would license the software and royalties would be distributed periodically to STI and Bomar individually, or (2) Boeing would completely buy out the software without making any royalty distributions.

Sweet met with Bomar and Jewell to discuss the possibility for a licensing agreement, and he also met Moser, who played a small role in the negotiations as counsel for FBN and EAB. In the negotiation meetings, Sweet viewed Bomar as the lead negotiator, but Jewell seemed to be the primary decision maker. After extensive discussion, the negotiations broke down because Jewell asked for more "upfront cash" than Boeing was willing to offer. Sweet returned home, and the negotiations continued through correspondence. According to Bomar, Jewell and Moser acted arrogantly toward Sweet during the one-on-one negotiations. In fact, Bomar thought Jewell and Moser had handled the deal in such an unprofessional manner that he considered suing them for malpractice.

In June 1997, Jewell sent two letters to Sweet on behalf of his purported clients STI, Bomar, and EAB. The letters proposed an amended business plan in which Boeing could either purchase

the MLMS software or purchase the common stock of STI. Then, on October 28, 1997, Jewell sent another letter offering Boeing a deal to license the software with a fixed term and renewable options to purchase. On November 6, 1997, Sweet replied to Jewell's letters by rejecting his offers and submitting a final proposal. The final proposal was not accepted.

In January 1998, Boeing sued STI and FBN for money STI owed under the joint contract with Coca Cola. The complaint specifically alleged that representatives of STI made fraudulent misrepresentations to Boeing with regard to the proposed licensing agreement and FBN aided and abetted STI in making those representations. The parties reached a pretrial settlement whereby STI agreed to pay Boeing the sum of $640,000.

On March 21, 2000, an STI stockholder's meeting was held at the offices of Jewell, Moser, Fletcher & Holleman, P.A. During the meeting, Jewell informed the stockholders that three of STI's creditors were threatening litigation. Namely, STI owed in excess of $ 2,000,000 to FBN and $500,000 to Jewell, Moser, Fletcher & Holleman, P.A. As a result, Bomar resigned from the board during that meeting. He later sent a letter to Jewell and Moser, stating his intention to start a new company and license the MLMS software from STI.

In the spring of 2002, representatives from the FBI and the Department of Justice approached Bomar concerning a pending criminal investigation of Moser. They informed Bomar that he had been listed as president of two corporations other than STI and his signature appeared on *pro se* pleadings for those corporations in federal court. Bomar also discovered that FBN still held an insurance policy on his life two years after his resignation, and the policy was for five million dollars, rather than the one million dollars he had been led to believe it was worth. Bomar then commenced his own investigation. He learned from Dan Elliot, an IRS investigator, that EAB and FBN were shell corporations set up by Jewell and Moser for the purpose of siphoning money from their client trust accounts into STI. Bomar also discovered that Fran Post, who had been represented to him as FBN and EAB's president, was merely FBN's agent for service of process. This information led Bomar to conclude that it was Jewell and Moser, and not the shell corporations, who thwarted the Boeing deal.

In January 2004, Bomar filed a legal malpractice suit against Jewell and Moser, claiming breach of fiduciary duty, negligence, and fraud. He specifically asserted that Jewell and Moser breached

their fiduciary duty to him because they falsely represented that FBN and EAB, their alleged clients, invested in STI and stopped the Boeing deal. During discovery, Jewell and Moser both asserted their Fifth-Amendment privilege against self-incrimination and thereby avoided giving depositions and answering some of Bomar's interrogatories. Both Appellees filed motions for summary judgment against Bomar, contending that he had no standing to sue, and his claims were barred by the applicable statute of limitations. Moser also argued in his motion that he was not liable because he did not have privity of contract with Bomar. Bomar replied by arguing that he had standing and the Appellees' acts of fraudulent concealment tolled the statute of limitations. He also filed a motion to strike the Appellees' affirmative defense of the statute of limitations because they had asserted their Fifth-Amendment privilege and thereby thwarted any meaningful discovery.

After hearings on the motions, the circuit court entered an order, releasing Moser from liability on the claims of negligence and breach of fiduciary duty. The circuit court later entered another order denying Bomar's motion to strike and granting Appellees' summary-judgment motions on the basis that Bomar lacked standing and his claims were barred by the statute of limitations. Bomar now appeals from that order.

### Standard of Review for Summary Judgment

A motion for summary judgment should be granted when, in light of the pleadings, and other documents before the circuit court, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ark. R. Civ. P. 56(c) (2006). When reviewing whether a motion for summary judgment should have been granted this court determines whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 11 S.W.3d 531 (2000). The burden of sustaining a motion for summary judgment is always the responsibility of the moving party. *Id*. All proof submitted must be viewed in a light most favorable to the party resisting the motion, and any doubts and inferences must be resolved against the moving party. *Id*.

We recognize a "shifting burden" in summary-judgment motions, in that while the moving party has the burden of proving that it is entitled to summary judgment, once it has done so, the

burden then shifts to the nonmoving party to show that material questions of fact remain. *Id.* However, summary judgment is not proper where evidence, although in no material dispute as to actuality, reveals aspects from which inconsistent hypotheses might reasonably be drawn and reasonable minds might differ. *Id.* The object of summary-judgment proceedings is not to try the issues, but to determine if there are any issues to be tried, and if there is any doubt whatsoever, the motion should be denied. *Id.*

## Standing

Although Bomar does not argue standing as his first point on appeal, the question of standing is a threshold issue that must be addressed first. *See Farm Bureau Ins. Co. of Ark., Inc. v. Running M Farms, Inc.,* 366 Ark. 480, 237 S.W.3d 32 (2006). Appellees argue that Bomar lacked standing to bring suit against them because his claims were based upon an injury to STI as a corporation and not to himself individually. Bomar, however, argues that he has standing because he would have received individual royalties and employment under the Boeing licensing agreement.

This court acknowledges the "near universal" rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock. *Farm Bureau Ins. Co. of Ark., Inc. v. Running M Farms, Inc., supra.* We recognize that, under Ark. R. Civ. P. 23.1 (2006), a shareholder may bring a derivative action on behalf of a corporation to enforce a right of the corporation when the corporation has failed to do so. *Id.* However, in order for a shareholder to bring an individual cause of action against a third party, the shareholder must be injured for a wrong directly or independently of the corporation. *Id.* This court has also determined that individual stockholders do not have standing to sue in their individual capacities for injuries allegedly suffered primarily by the corporation and its shareholders. *Id.* Direct suits brought by a shareholder are only appropriate when the shareholder asserts an injury that is distinct and separate from the harm caused to the corporation. *Id.*

In Bomar's deposition he admitted that his claims against Appellees were based solely upon his allegations that they mishandled the Boeing negotiations. Jewell and Moser based their motion on Bomar's admission, claiming the only person with standing to bring the action was STI as a corporation. Bomar, however, argued that he had standing to bring the action because he would have received employment and royalties from Boeing if

the licensing deal had succeeded. In support of his argument, Bomar presented the circuit court with copies of the various business plans that Boeing negotiated with STI, some of which provided for Bomar to personally receive employment and royalties from Boeing. Bomar also presented the court with Ken Sweet's deposition in which Sweet testified that Bomar would have received royalties and employment. In rebuttal, Appellees pointed out parts of Sweet's testimony that indicated Boeing was contemplating a complete buy-out of STI's software without any royalty distributions.

██ With regard to whether Bomar asserts an injury to himself that is separate and distinct from the harm caused to the corporation, contrary conclusions can be drawn from the evidence submitted by the parties and summarized herein. Accordingly, we hold that genuine issues of material fact exist concerning Bomar's standing to file the instant action. For that reason, we conclude that the circuit court erred in granting summary judgment on the standing issue.

### Motion to Strike

During discovery, Appellees asserted their Fifth-Amendment privilege against self-incrimination and thereby avoided giving depositions and answering some of Bomar's interrogatories. In response, Bomar filed a motion to strike their affirmative defense that his claims were barred by the statute of limitations. Specifically, Bomar argued that the circuit court should penalize Appellees because they evaded any meaningful discovery by asserting their Fifth-Amendment privilege.

We decided a similar issue in *Dunkin v. Citizens Bank of Jonesboro*, 291 Ark. 588, 727 S.W.2d 138 (1987). In that case, the defendant in a wrongful-death action claimed the affirmative defense of self-defense and made a blanket assertion of her Fifth-Amendment privilege against self-incrimination, stating that she would not answer any of the plaintiff's interrogatories. *Id*. The circuit court sanctioned the defendant by striking her affirmative defense, and we affirmed. *Id*. We clarified that sanctions are appropriate when a party uses his or her Fifth-Amendment privilege to preclude the opposing party from obtaining relevant and critical discovery. *Id*. Rather, assertions of the privilege should be limited to information that "clearly falls within its ambit." *Id*. at 591, 727 S.W.2d at 140. Additionally, for the privilege to be

properly asserted, the party asserting it should make a "particularized showing of the potentially incriminating nature of *each question asked and each document signed.*" *Id.* at 592, 727 S.W.2d at 140 (citing Wolfson, *Civil Discovery and the Privilege Against Self-Incrimination*, 15 Pac. L. J. 785, 793 (1984)).

■ Unlike the defendant in *Dunkin*, Appellees used discretion in answering Bomar's interrogatories. Instead of making a blanket assertion of their Fifth-Amendment privilege, Appellees answered several of Bomar's interrogatories and only asserted their privilege with regard to questions involving the Boeing deal. Appellees also gave clear reasons for not answering Bomar's interrogatories and for not giving depositions — namely, they were under investigation by federal law enforcement. Moreover, counsel for Bomar admitted in the motion hearings that Appellees properly applied their privilege and there were no unresolved discovery issues that did not properly fall under their Fifth-Amendment privilege. Accordingly, because Bomar cannot show that Appellees precluded his discovery by improperly asserting their Fifth-Amendment privilege, we affirm the circuit court's denial of Bomar's motion to strike.

■ Bomar also asked the circuit court to draw an adverse inference against Appellees because they asserted their Fifth-Amendment privilege. A review of the record, however, reveals that there is no ruling by the circuit court on this issue. It is well settled that a party's failure to obtain a ruling is a procedural bar to this court's consideration of the issue on appeal. *Hurst v. Dixon*, 357 Ark. 439, 182 S.W.3d 102 (2004). Thus, we are precluded from addressing Bomar's argument on this point.

### Fraudulent Concealment

Bomar's central argument on appeal is that the circuit court erred in granting Appellees' motions for summary judgment based upon the expiration of the applicable statute of limitations. Bomar admits that he brought his claims a full six years after the failed Boeing deal, which is well beyond the three-year statute of limitations for legal malpractice. *See* Ark. Code Ann. § 16-56-105(3) (Repl. 2006). Nonetheless, he argues that the statute of limitations was tolled by Appellees' fraudulent concealment of their wrongdoing. He specifically argues that Appellees fraudulently represented to him that EAB and FBN were their clients,

rather than their alter egos. He asserts that Appellees thereby concealed their role in frustrating the Boeing negotiations.

Appellees reply with the argument that Bomar was apprised of all of the facts surrounding the Boeing deal in 1997 when the negotiations took place. They also argue that even if Bomar did not know they were allegedly behind EAB and FBN, he was still aware of their law firm's $500,000 loan to STI. Finally, Appellees point out that Bomar could have used his right as a shareholder in STI to examine the company's books and discover any material information about FBN and EAB's involvement.

Though the question of fraudulent concealment is usually one of fact and unsuited for summary judgment, when there is no evidentiary basis for a reasonable difference of opinion, a circuit court may resolve the question as a matter of law. *Delanno v. Peace*, 366 Ark. 542, 237 S.W.3d 81 (2006). In *Meadors v. Still*, 344 Ark. 307, 40 S.W.3d 294 (2001), we clarified that in cases of fraudulent concealment we must apply the standard of review for summary judgment and the standard of review for determinations on the tolling of the statute of limitations due to fraudulent concealment. When the running of the statute of limitations is raised as a defense, the defendant has the burden of affirmatively pleading that defense. *Id.* But, once it is clear from the face of the complaint that the action is barred by the statute of limitations period, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the statute was in fact tolled. *Id.*

Fraud suspends the statute of limitations until the party having the cause of action discovers the fraud, or should have discovered it by the exercise of reasonable diligence. *Delanno v. Peace, supra.* For fraud to toll the statute of limitations it must be concealed. *Id.* Fraud consists of five elements that the plaintiff must prove by a preponderance of the evidence: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the representation. *Id.* (citing *Tyson Foods v. Davis*, 347 Ark. 566, 66 S.W.3d 568 (2002)). Fraudulent concealment consists of a positive act of fraud that is "so furtively planned and secretly executed as to keep the plaintiff's action concealed, or perpetrated in such a way that conceals itself. *Shelton v. Fiser*, 340 Ark. 89, 96, 8 S.W.3d 557, 562 (2000). Thus, in order to toll the statute of limitations on the basis of

fraudulent concealment, there must be (1) a positive act of fraud (2) that is actively concealed, and (3) is not discoverable by reasonable diligence.

In our recent case of *Delanno v. Peace, supra,* we dealt with the issue of fraudulent concealment in the context of legal malpractice. There, the plaintiff's attorney mistakenly represented to the plaintiff that he had obtained a tax clearance letter, absolving the plaintiff from tax liability on a recent purchase of assets. *Id.* Plaintiff relied on that representation and ignored tax notices from the state for three years. *Id.* But, eventually, the parties discovered that the attorney had inadvertently filed the tax clearance letter with the wrong tax identification number, and, due to the oversight, the plaintiff owed back taxes to the state. *Id.* The plaintiff then filed a legal malpractice action and alleged fraudulent concealment, but the circuit court granted the attorney's summary judgment motion on the basis that the statute of limitations had expired. *Id.* We affirmed because the plaintiff did not show that the attorney made intentional fraudulent statements or attempted to conceal any fraud. *Id.*

The plaintiff in *Delanno* also argued that because attorneys stand in a fiduciary relationship to their clients, the clients should be able to rely without qualification on statements of the attorney. *Id.* We rejected the plaintiff's argument, stating that such a theory would unduly restrict the statute of limitations for legal-malpractice issues and eliminate the client's duty to exercise reasonable diligence in analyzing the accuracy of the attorney's statements. *Id.* Instead, this court held that in situations such as the one in *Delanno,* where the client received information from an authoritative source which directly contradicted the representations of the attorney, it was incumbent upon the client to reconcile the contradiction by some act of reasonable diligence. *Id.*

*Delanno* and the case now before us are distinguishable in that the instant case does not involve an inadvertent misstatement of the facts. Here, Bomar produced evidence that Appellees committed positive acts of fraud. According to the testimony of Dan Elliot, an IRS investigator, FBN and EAB were set up as "shell corporations" for Appellees to invest money from their client trust accounts into STI. Bomar also submitted evidence of actions taken by Appellees to conceal their wrongdoing. First, Appellees, posing as FBN and EAB, obtained control of STI and took over the management of STI's finances. Then, they eliminated Bomar's ability to access STI's accounts and financial

records. Appellees also created a fictional president for FBN and EAB in Fran Post, the companies' agent for service of process. Finally, Appellees wrote letters to Bomar and others verifying that they represented FBN and EAB in the negotiations with Boeing.

Moreover, contrary to the situation in *Delanno*, it is unlikely that Bomar could have discovered the concealment of Appellees' wrongful acts through reasonable diligence. At least a material issue of fact has been created on this issue. Appellees had control of the books for STI, FBN, and EAB, and they maintained the sole communication between the companies. Appellees argue that Bomar could have discovered the financial status of STI by exercising his rights as a shareholder to examine the corporation's books, under Ark. Code Ann. § 4-26-715 (Repl. 2001). Yet, Bomar only had the right to access STI's books because he did not own stock in either EAB or FBN. Furthermore, it is unlikely that access to STI's books would have provided any information about the true nature of EAB and FBN, both of which were controlled by Appellees. Accordingly, we hold that summary judgment was improper because Bomar submitted evidence that raised a genuine issue of material fact as to whether Appellees committed acts of fraudulent concealment that tolled the statute of limitations.

### Derivative Liability

Appellee Jewell argues separately that he has no derivative liability for the actions of Moser. While he argued this issue in his motion for summary judgment, he never obtained a ruling from the circuit court. For that reason, we are barred from addressing the issue on appeal. *See Hurst v. Dixon*, 357 Ark. 439, 182 S.W.3d 102 (2004).

Affirmed in part, reversed and remanded in part.